UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NO.  14-CV-11300-KPN

_____

KIM PHILIBOTTE
      individually and as a representative of
      other persons similarly situated

      PLAINTIFF

v.

NISOURCE CORPORATE SERVICES COMPANY
      d/b/a  NISOURCE SERVICES INC.
      d/b/a  BAY STATE GAS COMPANY
      d/b/a  NORTHERN UTILITIES, INC.
      d/b/a  COLOMBIA GAS OF MASSACHUSETTS;

AGL RESOURCES INCORPORATED
      d/b/a  NICOR ENERGY SERVICES COMPANY
      d/b/a  COLUMBIA HOME SOLUTIONS

      DEFENDANTS

_____

**AMENDED
COMPLAINT / JURY DEMAND**

## I.  PARTIES

1.     Plaintiff Philibotte resides in Chicopee, Hampden County, MA.

2.     Defendant Nisource Corporate Services Company is a Delaware corporation licensed to

do business in Massachusetts with a principal place of business at 801 East 86th Avenue,

Merrillville, Indiana 46410.  This Defendant does business in Massachusetts as Nisource

Services Inc., a Delaware corporation with a principal place of business at

100 International Drive, Suite 175, Portsmouth, New Hampshire 03801 and as Bay State

Gas Company and Colombia Gas of Massachusetts that are Massachusetts investor-

owned utilities registered with the Massachusetts Office of Energy and Environmental

Affairs as having a usual place of business at 300 Friberg Parkway, Westborough,

Massachusetts 01581-5039. This Defendant at one time also did business in
Massachusetts as Northern Utilities, Inc. This Defendant is herein after referenced as
"Columbia".

3.      The Defendant AGL Resources Inc. is a foreign corporation with a principal place of
business at Ten Peachtree Place, N.E., Atlanta, GA. 30309 doing business in
Massachusetts as the Massachusetts foreign corporation registered entity Nicor Energy
Services Company, a Delaware corporation with a principal place of business at
1751 West Diehl Road, Suite 300, Naperville, Illinois 60563 that in turn does business in
Massachusetts by the tradename Colombia Home Solutions with a usual place of
business at 100 International Drive, Suite 175, Portsmouth, New Hampshire 03801. This
Defendant is herein after referenced as "AGL."

## II. JURISDICTION AND VENUE

4.      This Action asserts claims for violation of Federal Truth-in-Lending ("TILA")
requirements, *15 U.S.C. §1601 et seq* and Federal Regulation Z, *12 C.F.R. §226* that in
Massachusetts are subsumed into the Massachusetts Consumer Credit Disclosure Act
("CCDA"), *Massachusetts General Law Chapter 140D* and *209 CMR §§32.15 (5), 23.23(5)*; for
unjust enrichment; for violations of *M.G.L.c. 255D,* Massachusetts Retail Installment Sales and
Services Act ("RISSA"); and for violation of the Consumer Protection Act, *Massachusetts
General Law Chapter 93A, §§2, 9*, made on behalf of Kim Philibotte and all other persons
similarly situated. The Court has original jurisdiction over this class action pursuant to 28 U.S.C.
§§1331 & 1332(d)(2). This Court also has jurisdiction over this class action under 28 U.S.C.
§1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), provides
federal courts original jurisdiction over any class action in which any member of a class is a
citizen of a state different from any defendant, and in which the matter in controversy exceeds in

the aggregate the sum of $5 million, exclusive of interest and costs. Plaintiff is a citizen of Massachusetts. Neither Defendant Columbia nor AGL is incorporated in Massachusetts nor has a principal place of business in Massachusetts.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question) through the claim for violation of TILA. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in the District of Massachusetts under 28 U.S.C. §1391(b) as this is the judicial district in which the cause of action arose because substantially all, if not all, of the events and omissions giving rise to this claim occurred here.

### III. STATEMENT OF FACTS

**A.      Individual Claim**

6.      In or about January of 2011, Philibotte contacted Columbia after returning home from a vacation trip to discover that her hot water heater was not working. Columbia agents came to her home and told her that the best and cheapest way to proceed was for her to sign a falsely entitled "lease" of a Ruud (Rheem) 40 gallon regular vent water heater Model P2-40SF Serial #0610A00398 for "Total Payments" of $204. The fake "lease" terms were not explained to her nor was she given any required Truth-in-Lending disclosures as should have occurred because the fake "lease" was really credit sale and should have been revealed to be a credit sale as it truly was and is. A copy of the fake "lease" is attached as Exhibit A. This Ruud water heater at the time had a full retail market value including installation of $400 to $500 at most with a maintenance free life expectancy of at least ten years or more.

7.      The fake lease Exhibit A has no set end date and has a blank line for the "Lease Term". Exhibit A ¶2. It has only a "minimum" term of 12 monthly payments that automatically renew

without any affirmative act by the consumer and without any further notice to the consumer. Id. Once the water heater is installed it becomes a real estate fixture that is part of the Plaintiff's house and that is and must be sold with the house and consumers forget about it until it breaks and simply continue making the lease payments that are hidden in their monthly gas bill. The lease does not require that the water heater ever be returned and in fact Defendants do not want the water heater ever returned because such will cause them to incur the cost of removal and a disposal fee of $50 for a used water heater that has no value to Defendant once it is removed.

8.      Even if Plaintiff realized her error the next day after signing the lease, she would have to pay $761.57 to buy the water heater whose retail market value including installation is $500 at best — a 50% interest charge in one day. Id. ¶6. If she waited until the end of the first year, the buyout cost would equal $665.57 after having made $192 in lease payments; a total cost of $857.57 that would create an interest charge of approximately 80% for just one year of credit. Because the water heater has a minimum life expectancy of at least ten years, continuing the lease through the life expectancy of the heater would cost a consumer $1950 — for a water heater whose retail value was about $300 at most. Once the fake lease is signed, no matter what option is exercised the consumer loses significantly and pays an effective interest rate >25% a year. (The fraudulent lease contains other implicit options such as the ability to default immediately and keep and own the hot water heater for only the $16 because Columbia never had nor has any intention of ever taking it back and the "lease" does not required its return).

9.      Once the fake lease is treated as a credit sale, interest under TILA is calculated by treating the retail market value of the water heater as the principal with any other charges treated as interest or a finance charge that should have been disclosed.

10.     Unbeknownst to her at the time that she signed the subject fake "lease", something that

4

she would have discovered if given the required Truth-in-Lending and credit sale disclosure notices, the heater had a full retail value purchase price as new of approximately $300 and if installation were included of approximately $500 at most and probably as low as $400. As a new retail purchase, this heater would have come (and did and does come) with a six-year manufacturer's warranty. These heaters routinely last ten or more years. Even using a $500 retail/installation cost of the heater, Philibotte by the time of any purchase of the heater during its ten year minimum life expectancy would pay >25% annual interest on the value of the heater. A monthly maintenance plan from Columbia for a purchased water heater would have cost <$8/month.

11.     The heater lease provides that Columbia is responsible "for performing repairs as necessary to keep the Appliance in operating condition" but that Philibotte  "is responsible for having any routine maintenance required by the Manufacturer of the Appliance preformed by a qualified technician, at Customer's expense."  Given that the subject water heater comes with a six-year manufacturer's warranty (including a one-year full warranty), the Defendant's promise to perform repairs is a fraud intended to induce a consumer to sign the lease that actually gives no consideration for the so-called "lease".

12.     The facts of this case involve a water heater that is attached to the piping of a home, a "fixture" of the real estate. The supposed "lease" agreement recognizes it as a fixture:

> The Customer agrees and acknowledges that if a purchaser of the Premises does not promptly assume the Lease, then the Customer shall pay the Company the Buyout Price ... Exhibit A ¶7.

This clause is equivalent to stating that if a lessee in a vehicle lease agreement sells the garage holding the vehicle that the lessee must buy the vehicle from the lessor.

13.     Furthermore, under the lease, in the event of a default by the Plaintiff, such default "will

result in a termination charge equal to the Monthly Lease Payment due for the entire Minimum Term; plus any sales tax." <u>It does not require return of the water heater.</u> This default provision is no different from a mortgage or debt lien and shows the pretend "lease" to actually be a sale from Columbia to Philibotte. In fact, Columbia does not want any "leased" water heater to be returned but only takes back water heaters if specifically requested to do so by the homeowner — it loses at least $50 on any returned water heater because they are worthless used and Columbia must pay at least a $50 charge for recycling disposal.

14.     The "Lease term" is not a set time period at the end of which time the water heater must be returned but defines purely a "Minimum Term" of one year at the completion of which either party may terminate the lease upon "30 days written notice".  In the absence of such notice, as long as the water heater is functioning or can be repaired without replacement, the lease simply continues indefinitely. Unless either party cancels the lease after the end of the one-year minimum term, the lease essentially goes on indefinitely not only for the entire economic life of the water heater but until its functional life ends: it is beyond repair and must be re-placed. Only at this point must Philibotte re-qualify for a new lease. <u>Exhibit A,</u> ¶2.

15.     Defendant AGL through Columbia Home Services continues to use and to collet on the attached "lease" form. Defendants' own agents have admitted that the attached "lease" could last as long as "50 years." **— temporarily redacted —**.

16.     Once the water heater is installed, at no time does Columbia ever have any intention of ever removing the water heater unless specifically requested to do so by Philibotte or the owner of the home in which the water heater is installed. Even upon default or early termination, the attached fake "lease" does not require return of the appliance but only requires payment of the amount due for the entire Minimum Term.  <u>Attached</u> at ¶13. In fact, Columbia does not want any

"leased" water heater to be returned but only takes back water heaters if specifically requested to do so by the homeowner — it loses at least $50 on any returned water heater because they are worthless used and Columbia must pay at least a $50 charge for recycling and disposal.

17.     At all times, the warranty to any installed water heater runs to the owner of the home in which the hot water heater is installed. If Columbia were to remove the so-called "leased" hot water heater, the warranty would be void.

18.     After realizing that she was being ripped off in February of 2014, she exercised the entitled "option" to purchase of *§6* of the agreement. In response, Columbia sent her correspondence requiring that she must sign an "appliance sales agreement" ("P&S") making all sorts of misrepresentations and waivers and demanding that she sign this P&S in order to consummate the purchase — none of this is required by *§6*.  In order to continue concealing the fraudulent "lease" as a lease, the P&S demand represents to her that "[a]ny remaining warranty is automatically transferred to you at the time of purchase" despite the fact that Columbia is and at all material times was fully aware that the warranty always ran to the owner of the property in which the hot water heater is installed and that it thus never ran to Columbia and that it had nothing to transfer to Philibotte. In exercising her option, based on the demand by Columbia, she would pay a buyout price of $491.06 after having paid three years of monthly lease payments of $16/month for a total of $491.06 + plus 36 months of $16/month = $1067.6. According to the falsely entitled "option" to purchase of *§6*, the purchase price should have been $761.57 minus 50% of 36 months of $16/month ($288) = $473.67. Regardless of which figure is used (they may be the same if sales tax is added to the latter correct calculation), even by mitigating her damages by avoiding the continuing monthly payments, Philibotte still has damages of at least $600 consisting of the amount she paid ($1067.60) above the maximum $500 market value of the installed heater that she could have easily purchased if the Defendant had made required Truth-

7

in-Lending disclosures. The effective interest rate that she has paid by exercising the option to purchase now at the 3 year point would be 33% for the three years of the fake lease. Her only other option is to affirmatively cancel the lease and to go through the trouble of paying for installation of another water heater at the same price as the purchase option — approximately $400 - $500 — even though the present water heater is fully functioning, still has three years remaining on its warranty, and still has a minimum remaining life expectancy of seven years.

19.     From the moment that the fake "lease" was presented to and signed by the Parties, Exhibit A, the Defendants' intent and the economic reality was and is that the Plaintiff was intended to be the owner and did become the owner of the water heater.

**B.     Class Allegations / Economic Realities Test**

20.     The contents format of Exhibit A is the same contents format as used in all of Defendants' appliance lease agreements for water heaters and for all other appliances such as furnaces and conversions burners ("Agreement").

21.     The contents format of all of such Agreements is the same and is as follows:

   a)      it starts out with a listing of who's going to get the appliance and on what date;

   b)      then in its Item #1 it goes into the description of the appliance being leased that includes a "TOTAL INSTALLED PRICE";

   c)      the next Item #2 is entitled "LEASE TERM" that is defined as a "Minimum Term", which in this case is one but that may be as long as three years;

   d)      the next section marked Items ##3 - 5B lists amounts due based on the "Minimum Term" at signing, monthly, other charges, and total payments by giving monthly lease payments, lists other charges, and then lists "Total Monthly Payments Through Minimum Term";

8

e)      the next Item #6 gives "OPTIONS TO PURCHASE".


22.


**— temporarily redacted —**




**Q.      And according to your testimony, this figure is calculate by essentially using the retail cost of the water heater?**
A.      Yes.
...
**Q.      Now, the first page I believe we might have covered.  That's the cost to Bay State of the water heaters they were purchasing and leasing out?**
A.      That's correct.
**Q.      And you would use this figure plus the contractor's charge for installation plus a markup to reach the total installed price listed on the lease?**
A.      Yes.


23.     Defendants know that the "TOTAL INSTALLED PRICE" is not really the total installed price under the Agreement because such total varies with the length of payments under the Agreement as its agents have admitted under oath:

**Q.      The lease price, how come you don't give a total cost for the lease?**
MR. ALLEN:  Objection.  Go ahead.
**Q.      The figure you gave was on a monthly basis.  Do you have any access to total figures for total cost of the lease?**
MR. ALLEN:  Objection.  Go ahead if you understand the question.
A.      It's almost infinite of what a lease could cost somebody.  When you're leasing something, there's no end date to that lease.  He would determine the price.
**Q.      By "he," you mean the customer?**
A.      The customer would determine what they end up paying.

Also:

**Q.      All right.  Why do you – why does Bay State call that the total installed price, when it clearly isn't the total installed price?**
        MR. ALLEN:  Objection.  Go ahead.
A.      Why isn't it the total installed price?

> **Q.      Well, if they keep the – The total installed price varies on the length of the lease.  If they keep the water heater in there for ten years, the total installed price of the water heater is going to be a lot more than if they keep it in there for three or four years.**
> MR. ALLEN: Objection.  Go ahead.
> A.      This is the price to have the water heater installed.

24.    The "Lease term" is not a set time period but is defined by the contract as a "Minimum Term" at the completion of which either party may terminate the lease upon "30 days written notice". <u>Exhibit A</u>, *§2*. In the absence of such notice, the agreement provides that monthly payments will continue thereafter until either party elects to terminate the lease.

25.    The "Minimum Term" is either one year or three years depending on the appliance described in the first part of the Agreement.

26.    The Agreement has an "Options to Purchase" that "provides that the plaintiff 'has an option to purchase the Appliance by paying to the Company the greater of $75 or an amount equal to the Total Installed Price set out in Item #1, less 50% of the total Monthly Lease Payments paid through the purchase date.'" <u>Exhibit A</u>, *§6*.

27.    If the Agreement continues past its minimum term, it was possible for Philibotte (depending on how long she continues to make lease payments after the end of the minimum lease term) to purchase the water heater for as little as $75. The longer she continues to make payments, the lower the buyout price becomes. Such ownership is what the Defendants want and what is intended to occur under the Agreement.

28.    Defendants know that the actual term of the Agreement may continue 50 years or more and has a potential of "infinite" length"; "there's no end date to that lease."

29.     As of 20 February 2013, Defendants have approximately — **temporarily redacted** — active Agreements of which — **temporarily redacted** — have been installed since 2006 at the approximate rate of — **temporarily redacted** — per year; therefore approximately — **temporarily redacted** — of the active Agreements have terms that are ongoing for at least or more than seven years.

30.     Defendants keep track only of the total number of "leases" active at any one time and of the total appliances installed each month, it does not keep track of what happens to any individual appliance and it has no way to look up the length of any ongoing Agreement — though it claims to own each one of them — without going into each of the individual — **temporarily redacted** — files of its customers.

31.     Beginning in 2006, Defendant stopped keeping track of "buyouts" of its Agreements and did not start keeping track of them until sometime in 2010.

32.     It was only in 2010 that Defendants began as a normal business routine to send out letters confirming buyouts.

33.     Out of approximately — **temporarily redacted** — active Agreements, Defendants have produced buy-outs of such Agreements dated 2010 or later that total 16 buyouts. — **temporarily redacted** —

34.     — **temporarily redacted** —

35.     The Agreement involves an appliance that is attached to the piping of a home, a "fixture" of the real estate. The Agreement recognizes it as a fixture:

11

> The Customer agrees and acknowledges that if a purchaser of the Premises does not promptly assume the Lease, then the Customer shall pay the Company the Buyout Price . <u>Exhibit A</u> at ¶7.

36.     The manufacturer's warranty for the appliance described in the Agreement applies to its first place of installation, if it is removed from that first installation, the warranty is void.

37.     The manufacturer's warranty period on the appliance at issue is for a period of at least six years.

38.     Under the Agreement, in the event of an early termination (before the minimum term) by the Plaintiff, such "will result in a termination charge equal to the Monthly Lease Payment due for the entire Minimum Term; plus any sales tax". Because the Agreement does not require the return of any appliance at issue, by a simple early termination or default, a consumer would permanently have the appliance simply by paying the  "Monthly Lease Payment due for the entire Minimum Term".

39.     For a sale of any appliance, Defendants do not require an external credit check such as through Experian or "Equifax or another credit agency" but it does require such a credit check for a customer to qualify for the Agreement because "[w]e were putting an expensive piece of equipment in the home. We needed to verify that we would get our money for it."

40.     However, in the event of early termination or under any circumstances, Defendants' agents have admitted under oath that it is the policy of the Defendants to never pick up an installed water heater once it is installed in a home unless requested do so by the customer who is using it:

> **Q.      On the credit qualifications, do you know why they [Bay State and present owner lease program] wanted credit qualifications for a lease?**
> A.      Yes.  We were putting an expensive piece of equipment in the home.  We needed

to verify that we would have a way to get our money for it.

**Q.     Well, it was your water heater, right?**
A.     Correct.
**Q.     If you didn't get paid, you could take it back?**
A.     No.
**Q.     Why not?**
A.     It was not their policy to go in and remove a water heater from a home.

Also:

A.     – a letter from the collection agency.
**Q.     Yes.  But you, what does Bay State do at that point?  Do you charge termination fees?  Do you charge late fees?  Do you charge default payments?**
A.     I don't believe they're default payments.  There are late fees charged.
**Q.     What else do you do?**
A.     At some point, we'll cancel the customer.
**Q.     Then what happens?**
A.     Nothing.
**Q.     Well, do you go get the hot water heater?**
A.     No.  We bill them – we bill them the buyout.  So whatever the buyout calculation would be, we bill them, but we don't go get the water heater.

41.     Defendant does not keep track of what happens to any removed appliance. If removed it is given to the plumber who picks it up and the plumber does whatever they want with it.

42.     Thus under the Agreement and Defendants' usual business routine, once Philibotte or anyone signs the Agreement, the cheapest option is simply to terminate immediately the Agreement and pay the termination charge plus sales tax immediately.

43.     Defendants' agents themselves are not able to make the calculations required by the Agreement without access to their available charts and a calculator. Defendants know and it is the basis of their marketing strategy that a consumer under the circumstances of an at-home sale of an appliance cannot make the quick calculations necessary as TILA recognizes also.

44.     At the time of signing the agreement in July 2010, Plaintiff received all documentation regarding ownership and warranty of the water heater or anything that would be considered

"title" to the water heater and the warranty ran to her as owner of the initial place of installation and not to any Defendant.

45.     **— temporarily redacted —**

46.     Sometime in 2012, the Defendant Nisource Corporate Services Company sold its entire appliance leasing program called Nisource Services Inc. ("Nisource Services") for $120,000,000 to a company called AGL Resources Inc. ("AGL"). However, there appears to be exist a joint venture between the two that allows both of them to keep operating the leasing program in at least five states and together to expand it into the leasing of other appliances such as furnaces using the exact same lease form that is the subject of this Action.  For example, AGL bills for is ongoing Agreements through Columbia and the employees of AGL who run the leasing program are also agents of Columbia.

47.     Defendants' entitled appliance lease program does business primarily in Massachusetts but also in five other states consisting of Indiana, Ohio, Pennsylvania, Kentucky, and New Hampshire. It may also have outstanding contracts left over from another d/b/a called Northern Utilities in Maine and New Hampshire.

48.     **— temporarily redacted —**

49.     **— temporarily redacted —**

50.     As of 20 February 2013, Defendants have approximately **— temporarily redacted —** active Agreements of which **— temporarily redacted —**  have been installed since 2006 at the approximate rate of **— temporarily redacted —**  per year; therefore approximately —

14

**temporarily redacted** — of the active Agreements have terms that are ongoing for equal to or greater than seven years.

51.     **— temporarily redacted —**

52.     However, using this **— temporarily redacted —** number and the prices shown on the Agreement, by the seven year point which is approximately the time of the option to buy the water heater for a nominal value of $75, the Defendants have already charged the consumer three times the value of the appliance and at approximate interest rate of >21% year.**— temporarily redacted —**

53.     **— temporarily redacted —**

54.     Defendant's "Guardian Care" premium water heater maintenance plan that would provide full coverage for necessary hot water heater repair or replacement costs $7.49 a month and has a profit margin of **— temporarily redacted —** .

55.     Columbia in joint venture with AGL plans on expanding its appliance leasing program based on the subject Agreement of this Action into other appliances such as furnaces using either a one year or three year minimum term and into other states beyond the five to seven states in which it is already operating.

56.     The statutory damages allowed and required for violations of the CCDA, TILA, and RISSA are twice the finance charges plus attorneys' fees.   Even if not purchased outright, the Plaintiff and all others similarly situated could have easily obtained a more favorable rate of interest rate than charged by the Defendant for the purchase or lease of the subject equipment.

15

The actual damages consist of the excess interest or purchase price paid.  In addition, a violation of the CCDA is a *per se* violation of the <u>Consumer Protection Act</u>, *Mass. General Law Chapter 93A §§2, 9* warranting nominal damages, rescission, injunctive relief, fees, restitution, disgorgement of profits, and costs at a minimum even if actual damages cannot be precisely determined.

57.     At some point in 2012, AGL Resources, Inc. through its d/b/a's took over the Columbia Gas and other NiSource hot water lease programs and is now collecting all of the "lease" payments that are really credit sale payments without disclosing such misrepresentation to any of the fraudulently called "lessees". Not only is AGL knowingly and intentionally continuing the fraud under the same procedures and conditions, but based on its marketing intends to extend this fraudulent lease program to other fixtures such as furnaces and conversions kits and to continue this in at least five states. These new fraudulent lease programs are the same: AGL will install the fixtures into the home with no intend of ever removing them from the home with open ended leases that deceptively and unfairly wind up costing the homeowners usury interest rates unless the homeowner is lucky enough to catch and figure out on their own the convoluted mathematical interest disclosures that should have been made or that should be made by AGL as required by TILA.

58.     **— temporarily redacted —**

59.     Defendants use the term "Replacement Rentals" in their records to refer "to new water heater lease agreements entered into with customers whose previously leased water heater was replaced"  pursuant to ¶2 of the "lease" (<u>Exhibit A</u>, "[i]n the event the Company determines that the appliance cannot be repaired, the Company will replace the Appliance if a new lease is completed."). Thus, Defendants' claim that lease agreements from 2006 are <seven years old is

specious and is another sophisticated deception just as the fake lease is itself. Though the "replacement" water heater may be <seven years old, even assuming that the prior water heater that was replaced only lasted the expected life expectancy of ten years but no more, this means that approximately — **temporarily redacted** — customers paid monthly lease charges for <u>at least ten years</u>, the water heater broke and could not be repaired, and then began a new lease with a another water heater and the Defendants' con begins anew.

60.     The — **temporarily redacted** — estimate for active leases may be an understatement — as with all estimates by the Defendants — and that a better estimate is — **temporarily redacted** — .

CLASS ACTION ALLEGATIONS

61.     Upon information and belief, Defendants have committed such unfair and deceptive acts upon — **temporarily redacted** — similarly situated consumers during the last six years, thus there are thousands of cases in which Defendants violated its legal duties.

62.     Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to the *F.R.Civ.P.23* and *Mass-Gen. Laws Ch. 93A* ("Chapter 93A").

63.     The Classes represented by the Plaintiff consists of:

    1)      all persons who entered into an Agreement with Defendants for a hot water heater or similar appliance during the last six years.

64.     The Classes are such that:

    (1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

65.     The Classes satisfy *F.R.Civ.P. Rule 23* and Chapter 93A:

(1)     prosecuting separate actions by or against individual class members would create a risk of:

   (A)     inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

   (B)     adjudication with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)     the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)     questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

66.     There are questions of law and fact common to all members of the class, which questions predominate over any question affecting only individual class members.

67.     The principal common issues are:

      a.     whether Defendants disguised a credit sale as a lease;

      b.     whether Defendant breached its duties required by either statutory;

            regulatory, or common law substantive consumer protection law;

      c.     whether Defendant has prejudiced the rights of consumers by causing

            them damages;

      e.     whether Defendant's acts are an unfair and deceptive practice;

      f.     whether Defendant has been unjustly enriched by such acts.

68.     The only individual questions concern the identification of members of each class and the computation of relief to be afforded each class member that can be determined by a ministerial examination of the relevant lease records.  Notice can be provided to the class by various means of communication, as identified in the Defendant's computerized databases of customers and consumers.

69.     Plaintiff's claims are typical of the claims of class members.  All are based on the same legal and remedial theories.

70.     Plaintiff will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to claims stated herein. They are similarly situated with, and have suffered similar injuries as, the members of the class they seek to represent. Neither the named Plaintiff nor her counsel have any interest that might cause them not to vigorously pursue this action.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, in that:

a.   the losses suffered by the class members are such that prosecution of individual actions is impractical or economically unfeasible;

b.   by contrast, the illegal profits obtained by the Defendant as a result of its unlawful practices are substantial;

c.   the form of proof required is such that prosecution of individual actions is impractical or economically infeasible;

d.   in the absence of the class action device, the Plaintiffs and Class Members would be left without a remedy for the wrongful acts alleged, and the Defendant would be unjustly enriched.

e.   the prosecution of separate lawsuits by individual members of the class would create the risk of inconsistent adjudications with respect to individual class members, which would establish incompatible standards of conduct for the Defendant, making concentration of the litigation concerning this matter in this Court desirable;

f.   the claims of the representative Plaintiff is typical of the claims of the class; and

g.   no unusual difficulties are likely to be encountered in the management of this action as a class action.

72.   The class in so numerous as to make it impracticable to join all members of the class.

## COUNT I - TILA / CCDA

73.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs.

74.   Defendants' use of leases that are disguised credit sales is in violation of both

TILA and the CCDA including but not limited to *15 USC §§1601 - 1606, 1631 - 1632, 1635, 1640 -1641*; and *M.G.L.c. 140D, §§1, 3 - 9, 18, 19, 31 - 35.*

## COUNT II - UNJUST ENRICHMENT

75.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs.

76.     As a result of Defendant's practices, Plaintiff conferred a financial benefit upon the Defendant.  Defendant has been unjustly enriched at the expense of Plaintiff.  It would be unjust for the Defendant to retain such amounts.

77.     By reason of the foregoing, Plaintiff seeks restitution from Defendant and an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT III - RISSA

78.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs.

76.    Defendants' use of leases that are disguised credit sales is in violation of RISSA including but not limited to *M.G.L.c. 255D, §§1, 9, 10, 11, 31.*

## COUNT II
## CHAPTER 93A

77.     Plaintiff incorporates by reference paragraphs 1 – 76 set forth above.

78.     Defendants' acts constitute unfair and deceptive acts in violation of *M.G.L.c. 93A, §§ 2,*

*9* either directly or equitably through violation of the substantive standards established by the above referenced statutory, regulatory, or common law.  Defendants have failed to make a reasonable settlement offer in response to demands for such made pursuant to *§ 9* of *Chapter 93A*.

79.     Plaintiff is asking for both monetary and equitable relief pursuant to M.G.L. ch. 93A, §9 allowing plaintiffs in consumer protection cases to recover "other equitable relief, including an injunction, as [the court] deems to be necessary and appropriate."

WHEREFORE, the Plaintiff demands:

(1)     class certification;

(2)     damages together with statutory interest and prejudgment interest and consisting of expectancy, compensatory, incidental and consequential damages as determined by the Court;

(3)     monetary relief consisting of restitution and disgorgement of profits;

(4)     statutory damages;

(4)     attorneys' fees and costs;

(5)     double or treble damages;

(6)     equitable relief including but not limited to recision, restitution, disgorgement of profits, declaratory, and injunctive;

(7)     granting such other and further relief as the court deems just and proper.


**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES.**



                              Plaintiff by her attorney,

/s/ Valeriano Diviacchi

Valeriano Diviacchi
BBO# 555940
Diviacchi Law Office
111 Beach Street   #1A
Boston, MA 02111-2532
617-542-3175
Fax 617-542-3175
val@diviacchi.com

Date: 13 April 2014

CERTIFICATE OF SERVICE

I hereby certify that on 13 April 2014 I electronically filed the foregoing document with the First Circuit Court of Appeals by using the CM/ECF system.  I certify that counsel of record registered as ECF Filers will be served by the CM/ECF system and that paper copies will be sent to those indicated as non-registered participants on 13 April 2014.

/s/ Valeriano Diviacchi

23

**L6184**

Columbia Gas of Massachusetts
— WATER HEATER LEASE AGREEMENT —

☑ New ☐ Replacement    Permit #_____    Work Order # _102368871_

**Lease to "Customer" or "You" or "Lessee"**

Name _KIM PHILIBOTTE_    Billing Address _____

Installation Address _109 CREW ST CHIC_    WILLIAM A. HURLEY ("Premises") Floor _____

Salesperson _____    Installer _PLUMBING & HEATING INC_

Telephone No. _413-594-9109_    ☐ Consumer  ☐ Commercial  ☐ UCC Form Obtained

**LEASE AGREEMENT** dated _1/31/11_ is between Bay State Gas Company, d/b/a Columbia Gas of Massachusetts, a Massachusetts corporation, (the "Company" or "Lessor") and the above Customer. The Customer is the owner of the Premises. The Customer hereby leases from the Company the property described below (the "Appliance") for use at the Premises, subject to the terms and conditions of this Lease.

| 1. DESCRIPTION OF LEASED APPLIANCE:<br>☑ New ☐ Used | TOTAL INSTALLED PRICE | SERIAL NUMBER |
|---|---|---|
| MAKE AND SIZE _RWV 40 gal_ | | |
| MODEL _PZ-40 SF_ | _761.57_ | _A610A00398_ |

2. **LEASE TERM:** The term of this Lease shall commence on the date of installation of the Appliance and shall continue for a period of _____ Year(s) ("Minimum Term"), on the Appliance described in Item 1 above. After the completion of the Minimum Term the Company or Customer may terminate this Lease by 30 days written notice to the other. In the event the Company determines that the Appliance cannot be repaired, the Company will replace the Appliance if a new lease is completed. The Customer must qualify for the new lease at the time a replacement is requested. The Appliance is leased to the Customer for year round use. The number and amount of payments will not be reduced for seasonal use.

| 3. AMOUNT DUE AT LEASE SIGNING OR INSTALLATION | | |
|---|---|---|
| A) Payment due at time of standard installation or related Lease signing | $ | NONE |
| B) Other charges due at Lease signing/installation not included in Monthly Lease Payment (See Attached Survey Form) | $ | 0 |
| C) Total due at Lease signing or installation | $ | 0 |

| 4. MONTHLY LEASE PAYMENTS | | Monthly | Total Monthly Payments Through Minimum Term |
|---|---|---|---|
| A) Lease Payment | | $ 16.00 | $ 192.00 |
| B) Official Taxes and Fees | | $ 1.00 | $ 12.00 |
| C) Monthly Payment (4a + 4b) | | $ 17.00 | $ 204.00 |
| Minimum Term requires _12_ Monthly Payments | | | |

| 5A. OTHER CHARGES. Not part of your Monthly Payment or due at Lease signing. | $ 0 |
|---|---|
| 5B. TOTAL PAYMENTS. Total payments You will have paid by the end of the Minimum Term (3c + 4c + 5a) | $ 204.00 |

6. **OPTIONS TO PURCHASE:** The Customer has an option to purchase the Appliance during the term of the Lease or at the end of the Lease term by paying to the Company the greater of $75.00 or an amount equal to the Total Installed Price set out in item 1, less 50% of the total Monthly Lease Payments paid through the purchase date for the particular Appliance actually being purchased by the Customer, plus any sales tax (the "Buyout Price"). Repairs which are provided under this Lease are not available after the option to purchase has been exercised by the Customer.

7. **PREMISES TRANSFER/LIENS:** The Customer shall notify the Company 30 days in advance of any sale or transfer of the Premises, and shall notify in writing any prospective purchaser or tenant that title to the Appliance is with the Company. The Customer agrees and acknowledges that if a purchaser of the Premises does not promptly assume the Lease, then the Customer shall pay the Company the Buyout Price (see Item 6). The Customer agrees to protect the Appliance from any lien or encumbrance of any nature whatsoever resulting from its location on the Customer's Premises.

**SEE REVERSE SIDE FOR WARRANTY, LIMIT OF LIABILITY, AND OTHER IMPORTANT LEASE PROVISIONS**

By signing below, You, the Lessee, represent that (1) You are the owner of the Premises and You read and understood both sides of this Lease before You signed it; (2) You agree to be bound by the terms and conditions set forth on the front and back of this Lease; (3) The Company (directly or indirectly) has made no representations or warranties regarding the Appliance or services, other than those contained in this Lease; (4) That at the time You signed this Lease, it had been signed by the Company or its administrative representative, there were no blanks that had not been completed and the Appliance you requested was properly described above; and (5) You received a copy of this Lease and, if this is a Consumer Lease, the Notice of Cancellation (in duplicate) referenced in the next sentence. **IF THE LEASED APPLIANCE IS PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES, AND THIS LEASE HAS BEEN SIGNED AT A LOCATION OTHER THAN AN ADDRESS OF THE COMPANY, THEN YOU, THE LESSEE, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE NOTICE OF CANCELLATION FORM ATTACHED FOR AN EXPLANATION OF THIS RIGHT.** You may waive this statutory right to cancel for an emergency installation. Any waiver must be in writing.

The Customer and Company agree that a scanned or electronically reproduced copy or image of this Lease bearing their signatures (or the signatures of their authorized representatives) shall be deemed an original and may be introduced in any proceeding as competent evidence of the execution, terms and existence of this Lease.

_1/31/11_    _Kim Philibott_    _1/31/11_
Date Installed    Authorized/Customer Signature    Today's Date

_James A. Hurley_    _1/31/11_
Company or Administrative Representative    Today's Date

Continued on back.

Columbia Gas of Massachusetts • P.O. Box 569 • Portsmouth, NH 03802 • Attn: Leasing Department • 1-866-717-7715    ZM02

**COPY**

8.  A. **EXISTING EQUIPMENT:** If removed to permit the installation of the Appliance, may be set aside on the Premises and the Company shall not be responsible or liable for its condition or any disposal or reinstallation.
    B. **ASSIGNMENT:** This Lease is assignable only by the Company or its assignee; such assignment shall not require the Customer's consent.
    C. **EFFECTIVE DATE:** This Lease shall become effective when executed by the Company and the Customer or their properly authorized representatives. Customer waives notice of acceptance by the Company.

9.  **INSURANCE REQUIREMENTS:** Company does not insure the Appliance. There is no legal requirement for the Customer to insure the Appliance, however, the Customer is responsible for unreasonable or excessive wear, use or treatment of the Appliance, as described in Item 12.

10. **REPAIR, MAINTENANCE AND USE:** During the term of the Lease, and provided that all amounts due under this Lease have been paid in full and that the Customer is not otherwise in default under this Lease, the Company is responsible for performing repairs as necessary to keep the Appliance in operating condition and may enter the Premises for such purpose. The Customer has the duty to promptly notify the Company of any malfunction or defect of which Customer is aware. The Customer agrees not to remove or repair the Appliance without the Company's permission. **Customer agrees and acknowledges that Customer is responsible for having any routine maintenance required by the Manufacturer of the Appliance performed by a qualified technician at Customer's expense. Under the Lease, the Company does not provide Appliance preventive maintenance or any work intended to help prevent an Appliance failure from occurring in the future, or seasonal pilot re-lighting, tests, inspection (including inspection or testing of Appliance Temperature and Pressure Relief Valves), or replacing filters. Upon Customer's request, the Company may perform some of these services for an additional charge. YOU SHOULD READ THE MANUFACTURER'S INSTRUCTION MANUAL AND WARNINGS ON THE APPLIANCE BEFORE OPERATING THE APPLIANCE. YOU ARE RESPONSIBLE FOR OPERATING THE APPLIANCE IN ACCORDANCE WITH MANUFACTURER'S WARNINGS AND INSTRUCTIONS.**

11. **LIMITED WARRANTY AND LIMITATION OF LIABILITY**
    A. **CONSUMER LEASE:** (Appliance used primarily for personal, family or household purposes): The Appliance is expressly subject to the Manufacturer's Standard Warranty. **THE COMPANY, TO THE EXTENT PERMITTED BY LAW, SHALL BE RESPONSIBLE ONLY FOR SERVICE AND PARTS TO REPAIR THE APPLIANCE (SEE ITEM 10). TO THE EXTENT PERMITTED BY LAW, THE CUSTOMER'S SOLE REMEDY AND THE COMPANY'S LIABILITY FOR LOSS OF PROPERTY, GOODWILL OR PROFITS, OR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES SHALL BE LIMITED TO ONE THOUSAND DOLLARS ($1,000).** Any unauthorized work, repair, misuse, negligence or accident may void the warranty and any liability or obligations of the Company. The limited warranty is extended only to the Customer identified above and to no other person, assignee or transferee. Nothing in this provision shall operate to modify or exclude any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the Customer's remedies for breach of those warranties.
    B. **COMMERCIAL LEASE:** The Appliance is expressly subject to the Manufacturer's Standard Warranty. **THE COMPANY, TO THE EXTENT PERMITTED BY LAW, SHALL BE RESPONSIBLE ONLY FOR PROVIDING SERVICE AND PARTS TO REPAIR THE APPLIANCE (SEE ITEM 10). THE APPLIANCE IS BEING PROVIDED AS IS, AND THERE IS NO WARRANTY OF MERCHANTABILITY AND NO WARRANTY THAT THE APPLIANCE WILL BE FIT FOR ANY PARTICULAR PURPOSE. TO THE EXTENT PERMITTED BY LAW, ABOVE WARRANTY IS EXCLUSIVE AND NO OTHER WARRANTIES ARE EXPRESSED OR IMPLIED. TO THE EXTENT PERMITTED BY LAW, THE CUSTOMER'S SOLE REMEDY AND THE COMPANY'S LIABILITY FOR LOSS OF PROPERTY, GOODWILL OR PROFITS, OR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES SHALL BE LIMITED TO ONE THOUSAND DOLLARS ($1,000).** Any unauthorized work, repair, misuse, negligence or accident may void warranties and any liability or obligations of the Company. The limited warranty is extended only to the Customer identified above and to no other person, assignee or transferee. Nothing in this provision shall operate to limit remedies for the implied warranties of merchantability or fitness for a particular purpose with respect to injury of the person.
    C. The laws of the State where the Appliance is installed (i.e., the Premises), shall govern the interpretation and enforcement of this Lease. **Customer acknowledges that Customer has selected the location of the water heater and that Customer recognizes that these units, over time, will eventually leak and that  the location of the water heater should take such eventually into consideration, and that valuables should not be stored near or around the water heater.**

12. **STANDARDS FOR WEAR AND USE:** The following standards are applicable for determining unreasonable or excessive wear, use or treatment of the Appliance. Customer agrees to protect the Appliance from: any physical damage including but not limited to holes, dents, damage caused by freezing; or being partially submerged in water; and from any commercial use if this is a Consumer Lease. Upon any failure to protect the Appliance, Customer agrees to pay the Company for the cost to repair the Appliance or the Buyout Price (See Item 6) if the Appliance is in a condition beyond repair. Customer agrees to surrender the Appliance to the Company upon demand in the event of termination of this Lease under any of the provisions hereof in the same condition as it was at the time of installation, ordinary wear and tear excused, and the Company shall have the right to enter the Premises for the purpose of removing the Appliance. To the extent allowed by law, following termination where Customer continues to improperly possess the Appliance, Customer shall indemnify and hold the Company harmless from all claims, liabilities, costs and damages, which relate to the possession or use of the Appliance, including defense costs and legal and collection costs associated with Company attempting to remove the Appliance; such responsibilities are in addition to Customer's obligation to pay amounts due under this Lease. You should read the Manufacturer's instruction manual and warnings on the Appliance before operating the Appliance.

13. **EARLY TERMINATION AND DEFAULT:** Any termination by the Customer before the end of the Minimum Term set out in Item 2 above will result in a termination charge equal to the Monthly Lease Payments due for the entire Minimum Term less lease payments made through the termination, plus any applicable tax. However, the Customer may terminate this Lease without termination charge if the Company increases (except for government fees or taxes) the amount of the Monthly Lease Payment. The Customer shall receive 30 days notice prior to any rental increase. Unless the Customer shall give the Company written notice of his/her exercise of the termination option within such 30 day period, the Customer will be deemed to have elected to continue this Lease and shall be liable to pay the new Monthly Lease Payment commencing at the end of the 30 day period. The Company may immediately terminate this Lease under the following conditions: (1) Customer's failure to pay amounts due within 30 days of applicable statement date, (2) Customer's breach of the terms hereof, (3) if the Appliance cannot be made to operate satisfactorily, or (4) any time after 30 days written notice at the Company's discretion. Termination of this Lease by the Company based upon any breach by the Customer shall not constitute a waiver of any right by the Company under this Lease or applicable law.

14. **LATE PAYMENTS:** Any amount not paid within 30 days of the statement date shall be deemed delinquent and subject to a Late Charge of 1.5 % a month, which equals an ANNUAL PERCENTAGE RATE OF 18 %.

15. **PROPERTY/SECURITY INTEREST:** The Appliance is and shall at all times during the term of this Lease remain the personal property of the Company. Customer shall not tamper with or remove any tag or marking evidencing Company's ownership of the Appliance. By leasing the Appliance, the Customer obtains no property interest in the Appliance. The Customer agrees to and will cooperate with the Company concerning the execution and filing of the necessary forms and documents that establish a security interest under the Uniform Commercial Code in the Appliance. Customer by entering into this Lease authorizes Company to file any form or document appropriate to: (i) publicize or perfect its interest in the Appliance and/or (ii) collect any amount due under this Lease.



# Columbia Gas®
## of Massachusetts

*A NiSource Company*

## Customer Ownership Statement

I, *Kim Philibatt*      expressly represent and certify that I am the
(Name of Customer)
owner of the Premises. I further acknowledge that I own all appliances located at the Premises.
I acknowledge that the Company is relying on my statements when it enters into an Appliance
Lease with me.

*199 Carew St Chicopee, Ma*
Installation Address (Premises)

*1/31/11*
Date

*Kim Philibatt*
Customer Signature